AMERICAN CENTRAL INS. CO. et al. v. ISAACS. *

(Circuit Court of Appeals, Ninth Circuit.   January 6, 1919.)

No. 3105.

PRINCIPAL AND AGENT ⊙79(5)—LIABILITY OF AGENT—FRAUDULENT CONDUCT OF PRINCIPAL'S BUSINESS.

Evidence *held* sufficient to show that defendant, as agent for insurance companies for the sale of a salvaged stock of goods, was chargeable with fraud in selling the larger part of the goods in bulk to himself through a partner.

---

⊙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied February 10, 1919.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; Frank H. Rudkin, Judge.

Suit in equity by the American Central Insurance Company and others against David Isaacs. Decree for defendant, and complainants appeal. Reversed and remanded, with directions.

Jesse Olney, of San Francisco, Cal., for appellants.

Leon E. Prescott and Bert Schlesinger, both of San Francisco, Cal., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. We have examined the record in this case attentively, and are of the opinion that the judgment of the court below, dismissing the bill, cannot be sustained. The complainants were insurers in varying amounts, aggregating more than $20,000, on a stock of merchandise in the city of Seattle, owned by one Bridge, doing business under the name of A. Bridge & Co. While so insured, to wit, on August 11, 1913, a fire occurred in his store, almost immediately after which he made an assignment for the benefit of his creditors to one Truax, a representative of the Seattle National Bank. For the adjustment of the loss occasioned by the fire, Bridge and his assignee employed an insurance adjuster named Mason, and the insurance companies employed a like adjuster named Main. After some differences regarding the loss, Mason finally reduced the claim on behalf of the insured and his assignee to $16,200; Main conceding that the loss amounted to $13,588.65, but refusing to concede that it was more. It was agreed between them that the sound value of the insured stock before the fire was $34,300, and that the insurance companies would take over the stock and pay that amount therefor, which they did, having, through their adjuster, Main, made an agreement with Isaacs, the defendant to the suit, who, according to the evidence, was an expert salvage man, by which he agreed to sell the insured stock for the benefit of the insurance companies, guaranteeing that they should receive from such sale $18,100, which latter sum he agreed to and did advance to them, and upon the further agreement that he should receive for his services, so stipulated for, a commission of 20 per cent. on the gross amount realized on the sale. The result of this arrangement, therefore, manifestly was to insure the complainants against any loss in excess of $16,200 and Isaacs' commission of 20 per cent. on the gross amount realized on the sale.

Isaacs at once entered into possession of the storeroom and stock, advertised, and commenced on the 7th day of September, what is spoken of by the witnesses as a fire sale, and continued it for 19 days with marked success throughout, according to all of the evidence, excepting only the testimony of the defendant Isaacs, who, while admitting that it was wholly successful in the beginning, testified that the sales decreased from day to day, running down as low as $400 to $500 a day—the average daily expenses being over $200. Isaacs also testified as follows:

"About a week before the retail sale ended, I spoke with Mr. Main about discontinuing it. I told him we couldn't afford to continue the sale much longer, and that the best thing to do would be to finish the rest of the week, and then sell the stock out in bulk.    He said: 'Go ahead; use your own judgment. Isaacs, you know what will happen to that stock if you sell it in bulk to the merchants here; they will steal it; I don't think you will get 30 per cent. for the stock.' I informed him that I anticipated going in business in the Northwest, and that, provided I could get a lease on the premises, I suggested that I would put in a bid on this stock myself in the name of some other person, and that, if any one is willing to pay more than I, they are welcome to the stock.   Mr. Main asked me how I would conduct that sale, and I said, 'I will notify all the merchants in Seattle and the surroundings, accustomed to buying and dealing in that class of merchandise.'    He said, 'Very well; go right ahead;' and I immediately notified all the merchants who I thought were interested, Wasserman & Schirmer, Kessler, Colsky, Cone, and Buttnick. I received about eight or ten bids.    Wasserman & Schirmer bid 25 per cent.; Colsky, $4,200; Cone bid between 25 per cent. and 30 per cent.; Kessler's bid was 30 per cent.; and Buttnick bid between 25 per cent. and 30 per cent.   Branner Bros., of, Bellingham, Wash., made an offer of $10,000, conditioned that they could get the premises for continuing the sale, which I could not accept under those conditions.    These bidders came up to the store before the sale.   I showed them the original inventory given to me by Main.   I told them they would have to examine the goods and judge by that inventory.   I told them I would take an inventory of the goods that were left at the close of the sale, but I could not guarantee the amount of the goods that would be left.   I also put an ad in the Times on Sunday.   I did not think this would do any good, but thought it was the proper thing to do."

Isaacs stopped the sale Saturday evening, September 27th, and the advertisement so inserted in the Seattle Times the next morning—Sunday—was as follows:

"The balance of the A. Bridge & Co. stock, 103-05 First Ave. South, will be offered for bids Monday, September 29th, at 3 p. m.

"Coast Fire & Marine Insurance Co.,
"D. Isaacs, Manager."

Without conflict the evidence shows that, without waiting for such bidders as might have been attracted by such notice as was given by the advertisement, Isaacs sold the remaining stock in bulk at about 11 o'clock in the morning of September 29th to himself for 45 cents on the dollar of the invoice, aggregating $11,094, which he paid, less 20 per cent. thereof, which he deducted as his commission, pursuant to a bid, written out by himself with his own hand, in these words and figures:

"Mr. D. Isaacs, 103 First Ave., South, Seattle, Washington—Dear Sir:   I hereby submit to you the following bid of the A. Bridge stock: Forty-seven cent (8.47) on the dollar of the invoice price.    Hoping this meets with your approval, I remain, yours truly"

—and had his then employé, H. C. Seynei, sign it, with which employé, the evidence clearly shows, he had entered into a secret agreement, a few days after the commencement of the trust sale, to establish a partnership business with the stock so sold in the name of H. C. Seynei & Co., which was done; there being entered against that firm on its books a charge in the said sum of $11,094.

It is thus apparent that this trustee not only sold the trust property

to himself for 2 cents less on the dollar of the invoice than he himself bid therefor in writing, but that from the proceeds he deducted 20 per cent. thereof as a commission to himself, thus paying to his cestui que trust but $8,876. For the stock so purchased by him he charged upon the books of the firm of H. C. Seynei & Co., in which, according to the uncontradicted evidence, he continued a secret partner, the aforesaid full amount of $11,094. The evidence further shows that during the Sunday intervening between the close of the fire sale and the following day, on which he gave the public notice that the sale in bulk of the remaining stock would be made, he took an inventory thereof, aggregating $24,653; and the evidence shows without dispute that in the evening of the day on which said bulk sale was made, at a meeting between the two partners held in the Hotel Herald in Seattle, Isaacs, with his own hand, made in writing a list of the various articles of merchandise so sold in bulk, aggregating in value $24,603.39.

While it is true that he testified, as has been above set out, that he notified all the merchants he thought would be interested of the bulk sale, and enumerated the bids he said were made to him by the parties he named, such testimony is not only in direct conflict with that of a number of his employés who were in the store at the time, but is wholly inconsistent with that of the witness Bailey, an attorney at law, whose testimony, we think, bears upon its face every indication of truthfulness. That witness testified, among other things:

"As I had been told this sale in bulk was coming off Monday morning, by Mr. Isaacs, I went down at that hour, and was there when the bids were opened. Two men whom I did not know were complaining to Mr. Seynei that they would like to have bid, had they time to examine the goods before the bids were opened, but could not do it. I do not know how many bids were in, nor what any of them called for; but a few minutes afterwards Mr. Seynei came back and told me he had got the goods, but that he knew he would all the time. Before I left the store at this time Mr. Isaacs told me that: 'We have got the goods and they are all in perfect shape. Now we will put on a sale and make plenty of money.'"

Moreover, it appears that to the very brief and unusual notice that Isaacs caused to be inserted in the Sunday edition of the Seattle Times he affixed the fictitious name "Coast Fire & Marine Insurance Co.," and deliberately testified that he did not think the advertisement "would do any good, but thought it was the proper thing to do"; whereas, it is a matter of common knowledge that notice of such sales is deemed by the commercial world as not only highly useful, but is almost always, if not universally, published, not only once, but for such reasonable time as will enable prospective purchasers both to examine the stock to be sold, as well as to attend the sale; and such is the effect of the testimony of all of the numerous witnesses upon the subject, except the defendant Isaacs.

When to all of this is added the most pregnant fact that in the advertisement he expressly stated and notified the public that the sale would not be made until 3 o'clock of the afternoon of Monday, he in fact made it to himself, through his employé, Seynei, about 11 o'clock in the morning of that day, for the consideration and under the circumstances that have been stated, we are of the opinion that it is im-

possible to resist the conclusion that such sale was grossly fraudulent, and that the court below erred in dismissing the bill.

The judgment is reversed, and the case is remanded, with directions to that court to decree the sale in bulk fraudulent and void, and to compel the defendant to the suit to account for his proceedings as trustee, with leave to the respective parties to introduce such further evidence as they may desire and as may be proper.